**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

LINDA ADKINS                                                                                              PLAINTIFF

v.                                              No. 4:06CV01263 JLH

USABLE LIFE and JEFFERSON REGIONAL
MEDICAL CENTER LTD PLAN                                                               DEFENDANTS

**OPINION AND ORDER**

Linda Adkins filed this complaint against defendants pursuant to the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. alleging that her long term disability benefits were wrongfully terminated. The parties have filed briefs on the Administrative Record and the case is ready for disposition.

**I.**

Adkins began working for Jefferson Regional Medical Center on March 16, 1998, as a Service Rep II. (LAdkins 001.)[1] She participated in the Jefferson Regional Medical Center Long Term Disability Plan ("Policy") issued by USAble Life to Adkins's employer, Jefferson Regional Medical Center. USAble's claims administrator is Disability Reinsurance Management Services, Inc. The parties agree that the Policy is part of an employee welfare benefit plan sponsored by Jefferson Regional Medical Center and that the Policy is subject to ERISA.

Section II.B of the Policy provides the following definition:

TOTAL DISABILITY or TOTALLY DISABLED means during the elimination period and the next 36 months of disability the insured is:

---

[1] On January 4, 2007, the Court granted Adkins's motion for inclusion of the record Plaintiff's Exhibit #1, consisting of eight pages of documents consecutively numbered as LAdkins 001-008. (Document #18.) Therefore, the pages in the Administrative Record are identified as either USAble or LAdkins with the page number following.

      1.  unable to perform all of the material and substantial duties of his occupation on a full-time basis because of a disability:
          a.  caused by injury or sickness;
          b.  that started while insured under this policy; and

      2.  after 36 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(USAble 0051.)

Adkins submitted a claim for long-term disability benefits in June 2001, stating that she had been unable to work since October 1, 2000. (LAdkins 001-002). Prior to submitting her claim, Adkins had been seeing Dr. George Siu in California.[2] She first saw Dr. Siu in October 2000. In his progress notes of October 23, 2000, Dr. Siu reported that Adkins stated that she awoke on October 1, 2000, with her left leg limp, but that she recovered in about an hour, although she still had an intermittent limp. (USAble 0680-81.) She claimed that on October 6, 2000, she developed numbness and paresthesia[3] in her left hand and fingers which subsided after two days; however, she simultaneously developed weakness in her left hand and shortly her left arm and continued to limp. She noticed intermittent numbness and paresthesia of the face, and prior to that, she had noticed a vertex headache which had been getting progressively worse. She occasionally noticed slight twitching or movement of her left fingers and occasional involuntary movements of her left arm.

---

[2] Adkins was residing in Fresno, California at the time. She subsequently moved back to Pine Bluff, Arkansas.

[3] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1371 (30th ed. 2003).

Dr. Siu had a CT head scan done on Adkins on October 19, 2000. He did not see evidence of stroke, tumor or other abnormality. His impression was: "1. Headache, left weakness/hemiplegia and hemihypesthesia,[4] 2. Brain tumor, MS, cerebral infarct. 3. Seizures." (USAble 0681.)

Dr. Siu continued to treat Adkins. On November 2, 2000, he found no brain tumor, stroke, multiple sclerosis or other abnormality in the MRI brain scan. (USAble 0691.) On November 10, 2000, Adkins continued to complain of weakness of the left hand and arm. Studies of the left arm were normal and Dr. Siu stated that the findings highly suggest a supratentorial source.[5] He suggested to Adkins that the problems might be psychogenic[6] and he recommended physical therapy. (USAble 0689-90.)

Adkins returned to Dr. Siu on November 27, 2000, complaining of pain and swelling in her left hand and wrist. She had not started physical therapy. Dr. Siu found no objective findings but was concerned he might be missing a neuromuscular or other neurologic problem. He referred Adkins to the University of California at San Francisco and recommended that she start physical therapy. He opined that the problem "still could be psychogenic." (USAble 0687.)

Adkins saw Dr. Siu on January 17, 2001, with progressive left shoulder pain and no improvement in the strength of her left arm. He noted some resistance with the shoulder girdle and upper arm muscles, and the left shoulder was tender to palpation. He noted that there might be a

---

[4] Hemihypesthesia is "hypoesthesia on one side of the body; called also *hemihypoesthesia*." *Id*. at 829.

[5] Supratentorial means "superior to the tentorium of the cerebellum." *Id*. at 1795.

[6] Psychogenic means "produced or caused by psychological factors." *Id*. at 1539.

slight frozen shoulder. "Left brachial plexopathy[7] is still a possibility as is psychogenic source." (USAble 0686.)

On January 25, 2001, Dr. Siu noted that Adkins's shoulder pain was probably due to a frozen shoulder. He stated that he still had "no explanation for the weakness of the left upper extremity." He recommended that Adkins increase her physical therapy to three times a week, and prescribed Vioxx for the shoulder pain. (USAble 0685.)

On February 8, 2001, Adkins reported no progress with strength of her left arm, but that her left shoulder pain and range of motion had improved with the physical therapy. Dr. Siu noted that Adkins's left arm could be raised overhead almost fully without any significant pain, and there was no evidence of atrophy or fisculations. He stated: "As I discussed with her, this may well be psychological weakness since I can find no evidence of brain, spinal cord or nerve abnormality as a source. She will see Doctor Robert Layzer . . . to see whether or not there is indeed a neurologic problem." (USAble 0684.)

Dr. Siu referred Adkins to Dr. Robert B. Layzer, a neurologist with the Department of Neurology at University of California at San Francisco, who examined Adkins on February 12, 2001. After examining her, he stated that it appeared to be a conversion[8] reaction. He recommended that Adkins undertake a rehabilitation program with the assistance of a physiatrist. (USAble 0696.)

Adkins was referred to Dr. Michael P. Azevedo, a physiatrist, who examined her on April 2, 2001. Dr. Azevedo found that an MRI of Adkins's brain and cervical spine did not show any lesions

---

[7] Brachial plexopathy is "any neuropathy of the brachial plexus." *Id*. at 1453.

[8] Conversion is "an unconscious defense mechanism by which the anxiety that stems from intrapsychic conflict is converted and expressed in a symbolic somatic manifestation . . . ." *Id*. at 415.

4

or abnormalities that could explain Adkins's neurological symptoms. He diagnosed Adkins with "acute neurological abnormality involving a hypoesthesia[9] to pinprick sensation on the left face, left arm and left leg, as well as paralysis of the left leg. It is difficult to state what the etiology of this weakness and numbness is." (USAble 0694.) Adkins mentioned that several physicians who had examined her felt that the weakness was psychological. Dr. Azevedo suspected that she probably had conversion disorder[10] and had "no volitional control over the paralysis of her left upper extremity." (USAble 0694.) He recommended that Adkins be referred to a psychiatrist to determine the cause of the conversion disorder.

Adkins saw Dr. Siu on April 2, 2001. Dr. Siu found that Adkins had a frozen left shoulder and that the left arm and hand had very little motion, although he detected normal muscle tone. "As I indicated to her, I believe the left arm and hand weakness is due to a psychogenic source. Nevertheless she is to undergo rehabilitation." (USAble 0683.)

---

[9] Hypoesthesia is "a dysesthesia consisting of abnormally decreased sensitivity, particularly to touch." *Id*. at 894.

[10] Conversion disorder is:

"a mental disorder characterized by conversion symptoms (loss or alteration of voluntary motor or sensory functioning suggesting physical illness, such as seizures, paralysis, dyskinesia, anesthesia, blindness, or aphonia) having no demonstrable physiological basis and whose psychological basis is suggested by (1) exacerbation of symptoms at times of psychological stress, (2) relief from tension or inner conflicts (primary gain) provided by the symptoms, or (3) secondary gains (support, attention, avoidance of unpleasant responsibilities) provided by the symptoms. Many patients exhibit 'la belle indifference,' a lack of concern about the impairment caused by the symptoms; histrionic personality traits are also common. Symptoms are neither intentionally produced nor feigned, and are not limited to pain or sexual dysfunction."

*Id*. at 548.

In support of Adkins's application for long-term disability benefits, Dr. Siu submitted his attending physician's statement dated April 5, 2001, stating that Adkins had a diagnosis of left-sided weakness in arm and hand and brachial plexopathy. He noted that Adkins first visited him on October 23, 2000 and that the last visit was on April 2, 2001. He rated Adkins's physical impairment as Class 5, "[s]evere limitation of functional capacity; incapable of minimum (sedentary) activity," because her left arm was paralyzed. (LAdkins 003.) He found that Adkins did not have any mental impairments. (LAdkins 003.)

Dr. Siu submitted a Functional Capacity Form to Disability Reinsurance Management Services dated July 11, 2001. He noted that Adkins was restricted from her job activities because of her left arm being paralyzed. He expected that she would never be able to return to her occupation or other gainful employment because the left-arm paralysis. (USAble 0763.)

On July 30, 2001, Disability Reinsurance Management Services notified Adkins that her claim for long-term disability benefits had been approved based on her inability to perform the duties of her occupation. She was informed that benefits became payable on April 2, 2001. The approval letter contained the policy definition of "Total Disability" or "Totally Disabled" which stated that disability after 36 months of paid benefits means that the insured is not able to perform the material and substantial duties of her own or any other occupation. The letter did not contain any mention of a mental illness limitation. (USAble 0074-75.)

By letter dated October 26, 2001, Disability Reinsurance Management Services requested additional information from Dr. Siu. (USAble 0721.) In his office note dated August 16, 2002, Dr. Siu noted that Adkins's left shoulder, arm and hand were 0/5 to trace movement while her right arm and both legs were 5/5. She had no limp and her gait was steady. He opined that the observed left

arm/hand weakness and left hemihypesthesia were psychological as she split the tuning fork and there was not any reflex abnormality. As a result, she developed a frozen left shoulder, which had worsened. Dr. Siu noted that Adkins was relocating and recommended that she find a neurologist, physiatrist and psychiatrist for her care, including hypnosis. "Repeat MRI and C-spine scans might be helpful in view of the fact that a physician in Arkansas believes she had a stroke, which was not evident on previous scans and the exam shows no abnormality." (USAble 0722.)

On January 12, 2004, Disability Reinsurance Management Services sent Adkins a letter requesting additional information, in particular completion of a Training, Education and Experience form. (USAble 0082.) Disability Reinsurance Management Services again wrote Adkins on April 19, 2004 stating that it was reviewing Adkins's current disability status to determine her eligibility for continued benefits beyond April 2, 2004, under the total disability definition. (USAble 0089.)

After moving back to Arkansas, Adkins's treating physician was Dr. Manual Kelley. On April 3, 2002, Dr. Kelley sent an attending physician's statement to Disability Reinsurance Management Services which included the diagnosis of right cerebrovascular accident (CVA) with left hemiparalysis. (USAble 0397.) Dr. Kelley did not expect Adkins to have any significant improvement in the future and opined that Adkins's job could not be modified to accommodate the impairment. (USAble 0398.)

Dr. Kelley submitted another attending physician's statement dated March 29, 2004, which contained the same information. (USAble 0399-0400.) Subsequent progress notes from Dr. Kelley, dated June 30, 2004, January 6, 2005, February 3, 2005, and April 1, 2005, show Adkins complaining of weakness or paralysis on her left side and some dizziness. Dr. Kelley continued to

assess Adkins with a right cerebrovascular accident with left hemiparesis. (USAble 0402-05.) Dr. Kelley referred Adkins for physical therapy which she received at Baptist Health Therapy Centers from July 6, 2004, to October 25, 2004. (USAble 0408-21.)

Dr. Thomas Reeder, Medical Consultant for Disability Reinsurance Management Services, reviewed Adkins's claim and wrote a letter to Dr. Kelley on March 15, 2005. He stated that he had reviewed the records of Dr. Siu, Dr. Layzer, and Dr. Azevedo. Dr. Reeder wrote:

> After review of all the medical documentation available, it is apparent to me that her primary impairing condition has been psychiatric and the result of a conversion disorder. As noted above, she has had nonanatomic findings and never had imaging abnormalities consistent with stroke.

(USAble 0095.) Dr. Reeder asked Dr. Kelley to acknowledge whether he agreed that Adkins's primary impairing condition was conversion disorder, and that if he disagreed, he should provide specific findings to support his conclusions. (USAble 0096.)

Dr. Kelley signed Dr. Reeder's letter on April 12, 2005, indicating that he agreed with the assessment. (USAble 0676-77.)

On April 15, 2005, Disability Reinsurance Management Services sent Adkins a letter notifying her that she was no longer eligible for benefits. (USAble 0097-99.) Disability Reinsurance Management Services relied on the policy language of the mental illness limitation for its determination. In particular, the letter stated:

> As indicated above your policy contains a 24 month limitation for mental illness. Your physician's [sic] Dr. Siu, Dr. Layzer and Dr. Kelley as well as our medical consultant Dr. Reeder are in agreement that your condition is psychogenic in nature; therefore, since your policy contains a 24 month limitation you no longer meet the terms and conditions of your policy and your claim [is] now closed.

(USAble 0098.)

> The mental illness limitation, set forth in Section IV of the Policy, provides:
>
> Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations:
>
> 1. The insured is in a hospital or institution at the end of the 24 month period. The monthly benefit will be paid during the confinement.
>
> If the insured is still disabled when he is discharged the monthly benefit will be paid for a recovery period up to 90 days.
>
> If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.
>
> 2. The insured continues to be disabled and becomes confined:
>      a. after the 24 month period; and
>      b. for at least 14 days in a row.
> The monthly benefit will be payable during the confinement.
> The monthly benefit will not be payable beyond the maximum benefit period.
>
> MENTAL ILLNESS means mental, nervous or emotional diseases or disorders of any type.

(USAble 0061.)

Adkins appealed the decision on June 9, 2005 to USAble. (USAble 0107-11.) In support of her appeal, Adkins submitted another letter from Dr. Kelley dated June 20, 2005, a copy of Dr. Khan's May 4, 2005 notes, and therapy progress notes from Baptist Health covering the last half of 2004. (USAble 0112-36.) Dr. Kelley stated in his June 20, 2005, letter that he had been treating Adkins since July 12, 2001.

> The patient presented with a complete hemiparesis of the left upper extremity along with weakness of the left side of the face and weakness in the left lower extremity. The patient showed some mild improvement of function of the left upper extremity, but residual hemiparesis. I think the patient's findings are consistent with a right ischemic stroke with some expected return in functions.

(USAble 0112.)[11]

After a referral by Dr. Kelley, Adkins had a consultation with Dr. Usman Khan, a neurologist, on April 4, 2005. (USAble 0432-35.) Dr. Usman Khan stated the following in his May 4, 2005, report:

> This 44-year-old lady came to me with a history of weakness of the left side for the last four and a half years. She had been seen in California by a neurologist and had a comprehensive workup including a spinal tap, MRI and she was told all the results were normal. When I saw her earlier on this month, my impression was that she had a previous brain stem or internal capsule stroke causing the left sided weakness. Today, the patient raised the question that she has been told it is a psychiatric problem and I went back and examined her in much more detail and tried to force her to do things and see how she does. Her lower extremity strength seems to have improved which is usually not the case with a previous stroke. Her MRI and MRA are completely normal. We have a dilemma at our hands. The problem is if you have a previous hemispheric bleed that leaves you with neurological deficits it can resolve completely on the subsequent studies in a few months and you can still have residual from that. This patient is either an extremely good actor or she had a small lacunar stroke in the past causing these problems. What makes me wonder if her problem is really psychogenic and she is trying to manipulate us is the improved left lower extremity strength today which is very unusual. The best way we can resolve this is by getting the results of her previous studies from California and is [sic] suggested to the patient if she could get us the results of those medical records. What makes me wonder if it was really a stroke is the change in tone on the left side and certainly, patients cannot mimic that. Nevertheless, I would like to get the results of those studies from California. The patient will follow up with me prn and with Dr. Kelley.

(USAble 0113.)

Dr. Lorne Ryan, a neurologist, reviewed Adkins's prior medical records and performed an independent medical examination on September 6, 2005. (USAble 0139-41.) He stated the following:

---

[11] The record also contains a June 2, 2005, progress note. Adkins saw Dr. Kelley complaining of weakness on her left side. Dr. Kelley found Adkins was unable to abduct her shoulder and unable to flex or extend the shoulder, or flex and extend the elbow. She had a slight limp with walking. (USAble 0406.)

10

> This 44 year old woman has subjective complaints of left sided paralysis primarily of her upper extremity but has objective findings that suggest conversion reaction or malingering. The only objective finding on examination was a slight diminution in the circumference of her left forearm as compared to the right. She has had normal MRI's, MRA's, EEG's and EMG's. The diagnosis is conversion reaction versus malingering. The only limitations this patient has are based on her subjective complaints but are not supported by objective findings. . . .

(USAble 0141.)

USAble sent a copy of Dr. Ryan's report to Dr. Kelley on September 21, 2005, asking for his comments and opinion. (USAble 0143.) Dr. Kelley did not respond to the request, and by letter dated November 15, 2005, USAble notified Adkins that her appeal had been denied. (USAble 0155-59.) It reviewed the medical information, stating that "the preponderance of the medical evidence by several specialists supports that your claimed impairing condition is psychiatric in nature. Since mental and nervous conditions are limited to 24 months of benefits and you received over 36 months of benefits, you are not eligible for further benefits for this condition." (USAble 0158.) In the letter, USAble included policy provisions covering both the mental illness limitation and the total disability provision. It is unclear why USAble included the latter if it was relying only on the former for terminating Adkins's benefits.

Through retained counsel, Adkins filed a second appeal. (USAble 0167.) Adkins submitted additional medical reports from Dr. Stephen Holt, Dr. Brad Baltz, and Dr. Lee Walker.

Dr. Lee Walker, an internist, began treating Adkins around June, 2005.[12] Dr. Walker wrote on July 28, 2005, that Adkins was seen for evaluation on June 16, 2005 and June 30, 2005. "Her chronic medical diagnoses include, but are not limited to the following: IBS [irritable bowel

---

[12] USAble states that neither ir nor Disability Reinsurance Management Services knew that Adkins had changed from Dr. Kelley to Dr. Walker until after the second appeal was filed. (USAble 0352; *see* Pl.'s Br. Adm. R. at 7 n.2 (Document #20).)

syndrome], GERD [gastroesophageal reflux disease], CVA, Thyroid Disease, Anemia, Rheumatoid arthritis, and Hyperlipidemia . . . .[13]  Mrs. Adkins continues to undergo treatment for her medical condition."  (USAble 0171.)

> Dr. Stephen Holt, a rheumatologist, wrote, in a letter dated February 24, 2006:
>
> I've been following Ms. Linda Adkins since August 2005.  I see her for what's called an undifferentiated connective tissue disease manifested primarily as an antiphospholipid syndrome[14], as well as intermittent arthralgias.  It first manifested itself in 2000 with a cerebrovascular accident with a residual left hemiparesis involving the left arm greater than the leg.  This was felt most likely due to hypercoagulability due to her anticardiolipins (antiphospholipid syndrome).  When I initially saw her in August 2005 she had a loss of sensation in her left lower face, arm and leg, as well as spasticity of the left hand > left leg.  She also has a frozen left shoulder, arthralgias and joint tenderness.

(USAble 0169.)  Dr. Holt noted that Adkins had elevated sedimentation rate, elevated CRP, and a mildly elevated test for rheumatoid arthritis as well as elevated anticardiolipins.  Dr. Holt placed Adkins on blood pressure medicines, as well as aspirin, fish oil capsules and high dose Vitamin D therapy.  Dr. Holt concluded:

> Ms. Adkins will have a great deal of difficulty maintaining any type of work position long term due to her prior cerebrovascular accident and left sided hemiparesis.  She would be severely limited obviously in use of her hands, and legs.  Unfortunately she is medically impaired to the degree that she would be unable to maintain any type of reasonable employment that she would be expected to perform.  I expect this at present and for the foreseeable future.

(USAble 0169.)

---

[13] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertriglyceridemia, hypercholesterolemia, and so on."  DORLAND'S, *supra* note 3, at 883.

[14] Antiphospholipid syndrome is "a multisystem inflammatory disorder characterized by the presence of circulating antiphospholipid antibodies and by thrombosis and vascular occlusion, spontaneous abortion, thrombocytopenia, valvular heart disease, and other less frequent symptoms."  *Id*. at 1810.

Dr. Holt referred Adkins to Dr. Brad Baltz of the Hematology/Oncology Clinic for further examination and testing. Dr. Baltz examined Adkins on November 3, 2005, and diagnosed her with hypercoagulable[15] state. (USAble 0233). He reevaluated her on November 29, 2005, and adhered to his diagnosis of hypercoagulable state. (USAble 0230.) Dr. Baltz advised Dr. Walker and Dr. Holt of his findings. (USAble 0229-31.)

Adkins was admitted to Baptist Medical Center in Little Rock, Arkansas on May 15, 2006. She had passed out and was unable to walk and talk. She first went to Conway Regional Medical Center, which determined that Adkins did not have a cerebrovascular accident. Adkins was transferred to Baptist Medical Center for further evaluation. Dr. Walker was the attending physician. (USAble 0248.)

Adkins was evaluated by Dr. Bradley Boop, a neurologist, for her complaint of new right side weakness and altered speech. (USAble 0252.) Dr. Boop found that Adkins had "a very bizarre pattern of slow strained speech that I see almost exclusively in functional illnesses or with somatoform disorder. She has no significant neurological signs." (USAble 0253.) Dr. Boop suspected that Adkins had a somatoform disorder.[16] (USAble 0253-54.) He recommended evaluation with psychiatry and that she begin physical therapy, occupational therapy, and speech therapy. (USAble 0254.)

Adkins was evaluated by Dr. Gene Reid, a psychiatrist, on May 18, 2006. (USAble 0255-56.) He found Adkins to be alert, and oriented in all spheres, and not to have delusions or

---

[15] A hypercoagulable state is "[c]haracterized by hypercoagulability," which is "the state of being more readily coagulated than normal." *Id.* at 880.

[16] Somatoform means "denoting physical symptoms that can not be attributed to organic disease and appear to be of psychic origin." *Id.* at 1722.

hallucinations. Adkins answered questions appropriately, but had flat affect and appeared worried and "a bit morose." Dr. Reid's impression was "depressive disorder, not otherwise specified and rule out conversion disorder." (USAble 0256.) He prescribed a trial of Lexapro and of Seroquel. He recommended a consult with Dr. Michael Inman for a psychological evaluation. (USAble 0256.)

On July 28, 2006, pursuant to USAble's request, Adkins's counsel submitted additional medical records from Dr. Walker, dating from August 2005 to March 2006. (USAble 0353.) Dr. Walker, in a letter dated March 27, 2006, noted that Adkins had "ongoing chronic medical diagnoses, which include CVA, Anemia, Hypercholesterolemia, Deafness, Alopecia, Graves Disease, GERD, Irritable Bowel Syndrome, Hypovitaminosis D, and Hypertension." (USAble 0454.) She was being followed by Dr. Holt and Dr. Baltz. Dr. Walker noted that Adkins continued to have gait and mobility problems, which Dr. Holt was evaluating further. Adkins was also under treatment by her neurologist "for management of her condition (post CVA in 2000)." (USAble 0454.)

USAble submitted Adkins's file for a medical review by Dr. Alan Neuren, who is board certified in psychiatry and neurology. (USAble 0384-90.) Dr. Neuren, after reviewing the medical records, concluded that Adkins was not disabled from a physical condition. "Her left sided weakness is not due to a disorder of the nervous system. It may be due to a conversion reaction. It may be malingering." (USAble 0390.)

By letter dated August 16, 2006, USAble notified Adkins's counsel that her appeal had been denied and it was upholding its decision to terminate long-term disability benefits. USAble stated in relevant part:

> Ms. Adkins['s] LTD benefits were originally terminated on April 15, 2005, as it was determined that her claimed impairment was due to a psychiatric condition for which she already received 24 months of benefits. Our records indicate, Ms. Adkins received benefits from April 2, 2001 to April 15, 2005. On April 15, 2005, it was concluded that Ms. Adkins['s] condition was a conversion disorder and as such the claimed impairing condition is a mental illness. Since mental, nervous or emotional diseases or disorders are limited to 24 months of benefits, and Ms. Adkins received over 36 months of benefits, we advised her that she was not eligible for further benefits for her claimed condition.

(USAble 0395.)

USAble then discussed Adkins's appeals. USAble noted that after the first appeal, Adkins underwent an independent medical examination by Dr. Ryan, who diagnosed Adkins with a conversion reaction. On the second appeal, USAble referred Adkins's file to Dr. Neuren for a "comprehensive review." USAble noted that Dr. Neuren stated that "there have been at least six neurologists who have suggested that Ms. Adkins['s] findings are psychiatric in origin and not neurological." (USAble 0395.)

> Dr. Neuren further stated that there are inconsistencies in exam findings that are apparent to specialists in nervous system diseases that might not be apparent to non-neurologists. In addition to normal imaging studies of the brain, Dr. Neuren noted other inconsistencies such as lack of reflex changes, non-anatomical sensory changes and lack of change in tone, all of which would be expected if Ms. Adkins['s] disability was due to a physical condition.
>
> Based on a review of the medical information in Ms. Adkins['s] claim file, we have concluded that the preponderance of medical evidence by several specialists supports that the claimed impairing condition is psychiatric in nature rather than neurological. Because mental and nervous conditions are limited to 24 months of benefits and Ms. Adkins has received over 36 months of benefits, she is not eligible for further benefits for this condition.

(USAble 0396).

USAble upheld the termination decision. Adkins then filed this action under ERISA.

**II.**

The parties agree that the Court must apply a *de novo* standard of review to the plan administrator's decision. Under this standard, the Court must determine, based on its own review of the entire record, whether USAble Life's decision was correct. *See Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993). The Court may allow the parties to introduce evidence in addition to that submitted by the plan administrator and "may wish to make findings of fact after a bench trial or on a stipulated fact record, rather than conducting the summary judgment review that is customary when applying the abuse-of-discretion standard." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003); *see Davidson v. Prudential Ins. Co. of America*, 953 F.2d 1093, 1095 (8th Cir. 1992) (in *de novo* review, no deference given to administrator's decision); *Taylor v. Kawner*, 898 F. Supp. 667, 672 (W.D. Ark. 1995) (in *de novo* review, court may make its own independent benefit determination).

The basis for discontinuing the benefits – the mental illness limitation – was not the basis for approval of the benefits in the first place. USAble admits that Adkins's claim was initially paid due to a physical condition. (USAble 0102.) Section IV of the Policy covers disability benefits. (USAble 0054-64.) Under the Termination of Disability Benefits provision, "[t]he monthly benefit will cease on the earliest of: 1. the date the insured is no longer disabled; or 2. the date the insured dies; or 3. the end of the maximum benefit period; or 4. the date the insured's current earning exceed 85% of his pre-disability earnings." (USAble 0058.) USAble did not terminate Adkins's benefits under any of the four provisions above. USAble did not find Adkins no longer disabled, she had not died, and she was not currently working. Adkins's maximum benefit period, under the Policy, was age sixty-five. (USAble 0043, 0058.)

In *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002), the Eighth Circuit stated that paying benefits does not operate "forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the property of an insurer's decision to discontinue those payments." At the time Adkins was awarded long-term disability benefits, USAble had all the available information on which Dr. Reeder relied to find that Adkins's condition was not physical; that is, he had the opinions of Dr. Siu, Dr. Layzer, and Dr. Azevedo that Adkins's condition might be psychogenic or a conversion disorder. Despite having this information, USAble determined that Adkins was suffering from a physical impairment and therefore was entitled to disability benefits under the general disability definition. It paid Adkins disability benefits from April 2001. Four years later, well past the two year mental illness limitation, USAble first raised the issue of mental illness or conversion reaction. The assessment leading to the conclusion that Adkins's disability was due to mental illness was based on a review by a Disability Reinsurance Management Services consultant of the same records that had been available before April 2001 when it found that Adkins was disabled due to a physical condition.

The information available to USAble when it terminated Adkins's benefits was substantially the same as when it granted benefits. Essentially, USAble reassessed the medical records on which it relied previously for its physical disability determination to find that Adkins suffered from a mental illness. While there was additional information considered after the initial denial of benefits, the information was basically the same as that presented earlier. The medical records continued to show the same inconsistencies with respect to the occurrence of a cerebrovascular accident and lack of objective medical findings. In a similar case, *McBride v. CenturyTel of Mountain Home, Inc.*, No.

04-3019, 2006 WL 2711488, *10 (W.D. Ark. Sept. 21, 2006), Chief Judge Jimm Larry Hendren found that insurer's shift of focus of the plaintiff's disability determination from physical to mental was not warranted. *See also Hairston v. Loctite Corp.*, 2006 WL 568326, *8 (E.D. Ark. Mar. 7, 2006).

Furthermore, there is insufficient evidence to establish that Adkins does suffer from a mental illness or psychiatric disorder. After seeing her one time and reviewing the somewhat ambiguous medical records, Dr. Ryan diagnosed Adkins as having conversion reaction. Dr. Siu, who had a much longer relationship with Adkins, only speculated that the condition might be psychogenic. Dr. Reid, a psychiatrist, did not find conclusively that Adkins suffered from conversion reaction. That Adkins had normal MRIs does not mean that she suffered from conversion reaction. Dr. Khan, in his April 4, 2005, report of his neurology consultation, noted that Adkins could have had an intracranial aneurysm bleed that resulted in left sided weakness that was completely resolved on the MRI. "[O]bviously we see patients who have intracranial bleeds and a few weeks or months later the MRI looks completely normal." (USAble 0203.) He further surmised that other possibilities could have caused her stroke including dissection of the carotid vessels, coma, coagulopathies, homocystinuria. (USAble 0203.) He also considered that a mitochondronial problem associated with hearing loss could have caused the stroke. (USAble 0204.)

The only reason Adkins has been labeled as having a mental illness is that the neurologists cannot account for her symptoms. Adkins has symptoms that the neurologists cannot explain, so they say that the symptoms are, or may be, psychiatric in origin. Other than the fact that the neurologists cannot explain Adkins's symptoms, and the fact that Reid found her "a bit morose," there is no evidence that Adkins has a mental illness. Adkins has weakness and numbness on her

left side.  The neurologists have no explanation for that weakness and numbness.  Those are the facts.  In the opinion of this judge, these facts are insufficient to support the conclusion that Adkins has a mental illness.

## CONCLUSION

The decision of USAble to terminate Adkins's long-term disability benefits is hereby reversed, and USAble is directed to reinstate those benefits, pay back benefits with interest current to the date of this Order, and continue to pay benefits in the future for as long as Adkins continues to be entitled to them under the terms of the Policy.  USAble is ordered to pay reasonable attorneys' fees and costs.  Judgment will be entered accordingly.

IT IS SO ORDERED this 21st day of November, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE